JUDGE P. COHOE V. STATE OF NEBRASKA.*

FILED OCTOBER 16, 1907.   No. 15,084.

1. Criminal Law: PRELIMINARY EXAMINATION. Upon complaint duly made, a judge of the district court may sit as an examining magistrate to try whether a crime has been committed, and whether there is probable cause to believe that the person charged has committed the crime.

2. ———: ———: WARRANT. When such complaint is filed in the district court and the person charged with crime in said complaint is present in court, the judge may in his discretion call upon the defendant to plead to the complaint, and proceed with the examination without the issuing of a warrant upon the complaint.

3. Larceny: RETURN OF PROPERTY: INSTRUCTION. The return to the owner of a part of the money stolen will not of itself prevent a prosecution for the larceny, and in a proper case it is not error for the court to so instruct the jury.

4. ———: TRESPASS. Trespass is one of the elements of the crime of larceny. There can be no conviction under section 114 of the criminal code unless the taking of the property by the defendant was unlawful.

ERROR to the district court for Nemaha county: WILLIAM H. KELLIGAR, JUDGE. Reversed.

E. B. Quackenbush, for plaintiff in error.

W. T. Thompson, Attorney General, Grant G. Martin, E. Ferneau and H. A. Lambert, contra.

*Rehearing denied. See opinion, p. 819, post.

SEDGWICK, C. J.

The defendant in this case was charged in the information with the larceny of $1,000 in gold. Upon the trial in the district court for Nemaha county he was found guilty and sentenced to imprisonment in the penitentiary.

1. The prosecuting attorney filed in the district court an application for leave "to file information in this court before the judge thereof as examining magistrate." The record recites that a showing was made to the court that the county judge "is incompetent to hear the same." Leave was given the county attorney as requested, and a complaint was filed in two counts, the first charging the defendant with the larceny of $1,000 in gold, and the second charging the defendant with the larceny of $1,000 in gold coin; "and paper money or currency of the amount and value of $1,000 lawful currency of the United States of America." No warrant was issued upon this complaint, the defendant being present in court. When the defendant was called upon to plead, he refused to do so, and a plea of not guilty was entered for him, and an examination had upon the complaint by the judge of the district court sitting as an examining magistrate. The judge found from the evidence that the crime charged in the first count of the complaint had been committed, and there was cause to believe that the defendant committed the same. The defendant was therefore held for trial in the district court. The first objection made to these proceedings is that the judge, as an examining magistrate, acquired no jurisdiction in the case because no warrant was issued for the arrest of the defendant. Some suggestions are also made of doubt as to the authority of the district judge to act as an examining magistrate, but this jurisdiction is given by the plain provisions of the statute (Cr. code, sec. 262), and has been recognized by this court in *State v. Dennison,* 60 Neb. 192, and *Van Buren v. State,* 65 Neb. 223. Section 286 of the criminal code provides that, when a complaint is filed, "it shall be the duty of such magis-

trate to issue a warrant for the arrest of the person ac-
cused." Section 288 prescribes what the warrant shall
be, and it is manifest from these two sections that the sole
object of the warrant is to bring the offender within the
jurisdiction of the court. No authority is cited for the
proposition that the formality of issuing and returning
the warrant must be gone through with when the person
accused is already in the court, and we see no reason for
such a ruling under the provisions of the statute.

2. The second contention is that the court erred in ar-
raigning the defendant. While the jury were being ex-
amined as to their qualifications to sit as jurors in the
case, it was discovered that the defendant had not been
arraigned on the information. No evidence had been
taken, nor indeed had a jury yet been accepted and sworn
to try the case. After the defendant had been duly ar-
raigned, the jurors were re-examined as to their qualifica-
tions to try the case, so that the whole trial was had after
the arraignment of the defendant. There was no error in
this proceeding on the part of the court.

3. The defendant admitted that the money described in
the information had been in his possession, and he after-
wards returned $145 thereof to Boyd, the guardian. The
court instructed the jury that the return of this money by
the defendant "is not of itself sufficient to entitle the de-
fendant to an acquittal." The court in this instruction
set forth the elements of the crime charged, and told the
jury that if all these had been proved beyond a reasonable
doubt the defendant would be guilty, notwithstanding the
subsequent return of a part of the money. This instruc-
tion is complained of in the brief, but we think the ob-
jection is without merit. The fact of the return of this
money having been proved, it was proper that the jury
should know the legal effect of such evidence, and we can-
not see that the defendant was prejudiced thereby.

4. The defendant, as before stated, was charged with
the larceny of the gold. He insisted upon the trial that
he came lawfully into possession of the gold, and could

not therefore be convicted of the crime of larceny. The legislature has provided without possibility of misunderstanding that larceny and embezzlement constitute two crimes; that no one can be convicted for the one upon information or charge of the other crime. Section 114 of the criminal code makes it criminal to steal money or other property therein named of the value of $35 or upwards, and provides the punishment therefor. The section does not define larceny, and does not prescribe what acts shall constitute stealing, and early in the jurisprudence of this state it was decided that resort must be had to the common law to ascertain the constituent elements of the crime. *Thompson v. People,* 4 Neb. 528. And in *Barnes v. State,* 40 Neb. 546, it was determined that the word "steal," as used in this section of the criminal code, includes all the elements of larceny at common law, and that an instruction defining it is faulty if it omits any essential element. In *Bubster v. State,* 33 Neb. 663, it was decided that in a prosecution for larceny, unless some good reason exists for not doing so, the owner of the property stolen must be called as a witness to prove that he did not consent to the taking possession of the property by the defendant, and in *Perry v. State,* 44 Neb. 414, it was held that, if the owner of the property alleged to have been stolen is examined as a witness upon the trial, there can be no conviction unless he testifies that he did not consent to the taking of the property. There is no uncertainty in the common law upon this question. If the original taking of the property is with consent of the owner, the crime of larceny is not committed.

Section 121 of the criminal code defines embezzlement, generally, and prescribes the punishment therefor, and in other cases not covered by this section, if one obtains possession of property with the consent of the owner, so that he does not become a trespasser in so doing, and afterwards converts the property to his own use with intent to steal the same, he may be prosecuted under the act of 1875. Laws 1875, p. 26. Under the information in this

case charging that the defendant did steal the property in question, there could be no conviction without proof that the owner did not consent that the defendant should take and remove from its hiding place such secreted valuables as he might find on the premises. If the owner consented that the defendant should take possession of the property found for the purpose of delivering it to some other person, or for any purpose whatever, such taking of the property would not be unlawful, and there can be no larceny without an unlawful taking.

It appears from the evidence that one Ulbrich had before the time of the alleged larceny been found to be insane, and one Boyd had been appointed as his guardian. Ulbrich, shortly before his insanity, had sold property and received several thousand dollars therefor, and the guardian was unable to find or satisfactorily account for this money. It was supposed that Ulbrich had concealed the money upon the premises in Auburn, where he resided at the time he became insane. These premises were rented to the defendant, and he was living there with his family at the time of the transaction complained of. It was conceded that the defendant found the money, which he is charged with having stolen, upon the premises in question, and that soon after finding the gold he took it to Nebraska City, and, having squandered at least a part of it, then went to Omaha, and afterwards returned to Auburn, and informed the guardian that he had lost all the money while drunk except $145 in gold, which he returned to the guardian. He insisted that he had been authorized to take possession of the gold, and that his wrong doing consisted in not delivering the gold to the guardian, as he had been instructed to do; whereas, the prosecution insisted that he had no authority to take possession of the gold, but that it was his duty, without taking the gold, if he found it, to inform the guardian. The defendant insisted that, under the evidence in this case, this question should be submitted to the jury, but the court held, over the objection of the defendant, that there was

no evidence tending to show that the defendant was authorized to take possession of the gold for any purpose, and refused to submit that question to the jury under proper instructions requested by the defendant. We think there is no doubt that the learned trial judge was mistaken in this holding. There is much evidence tending to show that the defendant was not authorized to take possession of the gold, and that he intended from the first to find the money, if he could, and to convert it to his own use. It appears that upon a former occasion he had reported to the guardian that he had found $50 upon the premises, and that he returned this $50 to the guardian, and received a reward. Later he reported to the guardian that he had found some money. His statements in regard to it and in regard to the amount that he had found were confused and evasive. He first represented that at this second finding the amount found was $800, but afterwards admitted that he had found $1,800, and, finally, after much hesitancy and quibbling, gave the $1,800 to the guardian. He demanded a share of this money for his services and was allowed a liberal reward. On the other hand, there was clear and substantial evidence that he was authorized and instructed to look out for hidden money while he was making certain repairs on the premises, and, if he found it, to deliver it to the guardian. Mr. Boyd, the guardian, testifies that he rented the place to the defendant for the agreed price of $100 a year; that the defendant was to pay for the first six months' rent by labor on the place, and the next six months he was to pay cash. And he further testified that, "when he started to fix up this place, I told him to be particularly careful when he changed anything in the way of plastering, or cupboards or boards, anything of that kind; that I thought Mr. Ulbrich had hid some treasure there, some money and papers, as I was unable to find anything up to that time, and I wanted him to be particularly careful to see just how the stuff was hidden so we might make a thorough search for it." In his cross-examination, describing this conversation with the defend-

ant, the witness said: "I wanted to get possession of them, and I also wanted to know how Mr. Ulbrich had hidden his stuff; that I believed he had some money hid away, and I knew he had some papers hid away, and I wanted to know how he had hidden them."

It appears that, when the defendant found the $1,800, Mr. Boyd went with him to the county judge, and that the county judge took part with Mr. Boyd in questioning the defendant and instructing him how to proceed in the future, and the county judge testified in regard to this conversation as follows: "At the last of the conversation I asked him if he found any more money down there would he bring it to Mr. Boyd or myself at once and turn it over to us, and he promised us he would, and I repeated the injunction to him several times and cautioned him about it. If you find any more money down there, you will bring it to us. And he promised us he would. Not only promised us he would, but appeared sincere in it." This testimony was substantially repeated by this witness upon his cross-examination. Mr. Boyd was again upon the witness stand, and testified that he heard this instruction by the county judge to the defendant, and that he heard the defendant promise that, if he found any more money, he would immediately take it to the county judge or to Mr. Boyd, and was asked if he made any objection to the instruction given the defendant by the county judge. He was not allowed to answer this question, apparently because it was not supposed to be proper cross-examination of the evidence which he had given in chief when first upon the witness stand. We can see no other reason why this evidence should be excluded, and it is not very apparent that there is any just ground for excluding it.

When the defendant had found this gold, he started to Nebraska City with it. On the way to the train he met an acquaintance, and told him that he had found some money, and that he was going to Nebraska City to deposit it in a bank, and borrowed $5 of him. He was asked if the

55

defendant told him why he wanted to borrow $5. He said that he did, but was not allowed to say what reason the defendant gave him for wanting to borrow the money. An offer was made to show that the defendant then said that he wanted to borrow the $5 to pay his expenses in going to Nebraska City because he did not want to use any of the money he had found on Ulbrich's premises, but this evidence was not allowed. The defendant was very much intoxicated. While on the train from Auburn to Nebraska City he was frequently drinking whiskey from a bottle, and was, in the language of an apparently disinterested witness, who saw him, "quite drunk and was drinking all of the time." Upon arriving at Nebraska City he was refused liquor because of his drunken condition, and went soon to a gambling room, and from one gambling room to another, where he lost considerable money, and afterwards, about 1 o'clock in the morning, left Nebraska City for Omaha. The evidence is not very satisfactory as to how much money he lost in gambling, nor as to what he did with the remainder of the money, but, when he returned to Auburn, he reported to Mr. Boyd that he had $145 left, which he delivered to Mr. Boyd. It was insisted that he was not responsible for his acts by reason of his drunkenness. This question was apparently fairly submitted to the jury and was resolved against the defendant. If the jury entertained a reasonable doubt as to whether the defendant was directed by the owner of the property to take possession of any papers or money which he might have found on the premises in question and deliver the same to the guardian or the county judge, the law would require that doubt to be resolved in favor of the defendant. The county judge appeared to speak with authority when, in the presence of Mr. Boyd, he directed defendant to take the money or property he might find and bring it to Mr. Boyd or to himself. Mr. Boyd had taken the defendant to the county judge as one who could speak with authority on the matter, and, if Mr. Boyd did not concur in the instructions given to the defendant, he

should have so informed the defendant at the time, and manifestly the evidence was in such condition as to require that question to be submitted to the jury under proper instructions. The court erred in refusing to do this at the request of the defendant.

The judgment of the district court is reversed and the cause remanded.

REVERSED.

The following opinion on motion for rehearing was filed December 18, 1907. *Rehearing denied:*

Insane Persons: TRESPASS. A guardian of the person and estate of his ward may authorize a third person to find and take possession of the ward's property, and such person, when so authorized, is not a trespasser in so doing.

SEDGWICK, C. J.

A motion for rehearing has been filed in this case, which is supported by an exhaustive brief in which it is strenuously maintained that the court erred in holding that the question should have been submitted to the jury whether the defendant was a trespasser in taking possession of the property when found. The gist of the argument is thus stated in the brief: "It attempts to shift the issue as to the ownership and possession of the money stolen. In theory this decision is based upon the proposition that the guardian, at the time of the conversation in the county judge's office with the defendant, was in control of, and had the right to order a change in the possession of, the $1,000 in gold, and from that time any trespass which might be committed as to this money would be against the guardian, and would be excused by the consent implied in his direction to the defendant. It is clear that the owner placed the money in the jar in the earth, and while it remained there undisturbed it was in his possession. The right of possession in the guardian under the law must not be confused with the possession of the real owner. The owner's possession was disturbed the first time when the

defendant removed the jar and took the money. * * * Assuming that it is established by the verdict of a jury that the guardian told the defendant if he found more money to bring it to him, did the guardian thereby excuse the defendant from larceny committed against the true owner of the money, or did this direction from the guardian change the offense from larceny to some other form of crime? The guardian not having at any time the possession of this money, it is clear that larceny from him as to this sum could not be maintained." Throughout the brief it is concluded, without very much argument of the point, that if the ward, when the guardian was appointed, was in the constructive possession of the gold he would remain in such constructive possession until the guardian had taken actual possession of the gold. The argument does not admit that constructive possession is in the holder of the legal title, that is, in the one to whom the right of possession has been legally transferred. It assumes that one in constructive possession of property must remain in constructive possession until the absolute possession has been changed; that is, that constructive possession cannot be transferred. It is probably unnecessary to discuss this proposition, since the conclusion does not depend upon it, as will appear from a careful consideration of the above quotation from the brief.

There can, of course, be no doubt that, when the guardian was appointed and the ward was deprived of his personal liberty—incarcerated in the asylum—the guardian had the right of possession of the ward's property, wherever situated, and in law was in control thereof. The guardian could, of course, take possession of the gold if he found it himself. It would be his duty to do so. If he had been present with the defendant at the time, he could, of course, have entrusted the gold to his possession. And, also, the guardian could, if he supposed that there was a probability that property of his ward of any description was hidden upon the premises, send his agents to take the property and to dispose of it for him. By doing so he would

not "excuse the defendant from larceny committed against the true owner of the money," but he would authorize the defendant to take possession of the money, and the defendant being so authorized would not be a trespasser in so doing. There can be no larceny without trespass, and no one can be guilty of trespass in doing that which he has been authorized by proper authority to do. It seems to us that there can be no doubt that the guardian was clothed with power to direct the disposal of this money when found, and that no authority as to its possession could be derived from any other source, and one who acted under the instructions of the guardian with regard to the possession of the money could not be a trespasser in so doing.

The question whether the instructions of the guardian, if they were as claimed by the defendant, would result in giving to the defendant the custody merely of the property as the servant of the guardian and for a specified purpose, is a more serious question, a question not presented in the original briefs and not much discussed in the present one. If the defendant and the guardian had been present when the jar containing the gold was found, and the guardian had entrusted the defendant with the jar to be delivered in a certain place, and the defendant had afterwards broken the jar with intent to steal the gold, there can be no doubt that the breaking of the jar and taking possession of the gold would be a trespass against the rights of the guardian upon the part of the defendant, but this was not the case here. It was, according to the defendant's theory, the money and not the unbroken package that was entrusted to the defendant to be delivered to the county judge or to the guardian, and this question,- as well as the other questions pointed out, should have been submitted to the jury under proper instructions. The technical and exact distinctions between larceny by bailee and larceny in general, created by the statute, must be observed by the courts. The defendant cannot be charged with the crime of larceny in general and convicted of the crime of larceny as bailee. The distinction of the common law between

these two crimes is expressly preserved by the legislature, and must be regarded by the courts. When there is conflicting evidence as to which of two crimes thus described has been committed, the question must be submitted to the jury, and cannot be determined by the courts.

We think that the judgment complained of is right, and it is therefore adhered to. Motion for rehearing

OVERRULED.